IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2017

**MICHAEL TERRELL MCKISSACK v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1016    Mark J. Fishburn, Judge**

_____

**No. M2016-02113-CCA-R3-PC**

_____

The Petitioner, Michael Terrell McKissack, filed a petition for post-conviction relief from his convictions of especially aggravated robbery, aggravated robbery, and facilitation of attempted carjacking. In the petition, the Petitioner argued that his trial counsel was ineffective (1) by failing to call two of his co-defendants to testify on his behalf; (2) by failing to inform him that his third co-defendant would testify against him; and (3) by failing to adduce proof during the guilt phase regarding his lack of education and mental health issues. The post-conviction court denied relief, and the Petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the Appellant, Michael Terrell McKissack.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Brian Ewald, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The Petitioner was charged with especially aggravated robbery, aggravated robbery, and attempted carjacking. On direct appeal, this court summarized the proof adduced at the Petitioner's trial as follows:

After joining a group of four young men intent on committing a robbery, the [Petitioner] participated in robbing one victim and then robbing and shooting another. The five men were apprehended as they drove away from the crimes, and ski masks such as those used in the robberies, along with property stolen from the shooting victim, were found in the car. . . .

Officer Hoadley testified that at 6:20 a.m. on January 20, 2010, he received a call regarding a robbery at Lincoya Bay Apartments . . . [, and the] dispatch informed Officer Hoadley that the suspects were driving a light blue or light tan Honda Civic hatchback with tinted windows. . . .

. . . .

Officer Hoadley was about to turn into the entrance to the apartments when he saw a vehicle generally matching the description of the suspects' car. The vehicle was a light-colored silver, two-door Honda with tinted windows. Because his siren was already on, he shut the siren off and honked his horn, and the car stopped at the intersection. He could see two men up front and could tell there were passengers in the back. He could tell the occupants were black. He stopped his patrol car with the nose pointing to the driver's side, and he walked behind the car to the passenger's side as another officer approached the driver. . . . At this point, he could see that there were five black men in the car and that at least one had dreadlocks. Officer Hoadley testified that he was receiving dispatches contemporaneously with the stop and that at some point, he was alerted there had been a second robbery and shooting where the suspects were black men with dreadlocks wearing dark clothing. The 911 recordings indicated that a bystander from a bus stop had called regarding the shooting, describing a black man dressed in white screaming and running from a black man wearing black and with a gun. The bystander heard a gunshot after escaping to his home. The second victim's girlfriend also described the shooting, telling the 911 operator that two very young-looking black men wearing black had shot her boyfriend, Roman Sanders, and that she had seen them run.

Officer Hoadley asked the passenger to open the window, and the passenger rolled the window partially down. Officer Hoadley could see that the majority of the men were wearing all dark clothing. The men stated that they did not live in the complex but were on their way to school. Officer Hoadley elaborated that they said that they were picking up someone to go to school, which did not make sense given that the car was full and none of the occupants lived in the complexes. They appeared nervous and were "not telling [Officer Hoadley] a whole lot."

Because he knew that the perpetrators of the crimes were armed and because he could not keep an eye on all five of the car's occupants at once, Officer Hoadley asked the men to get out of the car. They were immediately patted down and handcuffed. . . . They were separated and placed in patrol cars due to the rain. After they stepped out, he saw a brown wallet on the floorboard behind the passenger's seat, two ski masks, and one dark bandana. He testified that one of the dispatches had stated that masks were used. After an officer told him that a wallet had been taken, Officer Hoadley picked up the wallet and discovered it belonged to the second victim. A cell phone was also recovered.

. . . Kevin Boone, a co-defendant, testified that in the early morning hours of January 20, 2010, he, his twin brother Keith Boone, Kortez Potter Woods, and Mr. Woods's brother, Keith Potter, had been socializing at a basketball game and at clubs. He and Mr. Potter had court in the morning, so they were planning to sleep at the same house. Around 1:00 or 2:00 a.m., they went to Mr. Potter's house in Donelson, where the [Petitioner], known as "Ratchett," was apparently asleep. The four men were in Kevin Boone's car, which was a silver, two-door Honda Civic with tinted windows. Mr. Boone's twin, Keith, was driving, and according to Mr. Boone's testimony, Mr. Potter decided to pick up the [Petitioner] and go on a robbing spree.

When they pulled up to Mr. Potter's house, three of the men stayed in the car while Mr. Potter went to wake the [Petitioner]. The two spoke at the front of the house, and the [Petitioner] initially refused to participate in the robberies but

eventually relented to Mr. Potter's pressure and went to change clothes. According to Mr. Boone's testimony and photographs of the men at the time of their arrest, the twins were wearing white tops and the other three men were dressed in all black clothing. Mr. Boone's twin had a .38 special pistol under the passenger's seat, but Mr. Boone did not see any other guns until after the first robbery. The men chose to go to an apartment complex on the theory that there would likely be someone walking around in the early morning hours.

At the complex, the men saw a woman who would become the first victim, and Mr. Potter instructed Mr. Boone's twin to stop the car. The [Petitioner], Mr. Potter, and Mr. Woods got out, while the Boone twins remained in the vehicle during both crimes. Mr. Woods had a zip-up ski mask, and the [Petitioner] had a camouflage bandana. Although it was still mostly dark, Mr. Boone could see that someone had drawn a gun and aimed it at the first victim, but he could not tell who had the gun. He then saw one of his companions get into the woman's car and start it. Apparently, they could not operate the stick shift, and Mr. Boone saw the car jerk as the attempt to drive it failed. Mr. Woods returned to the car first and informed the twins that they had not gotten anything from the victim.

The first victim, however, testified that the men took her possessions. On January 20, 2010, she was preparing to leave for work around 6:10 or 6:15 a.m. She had her school bag, her keys, and her phone with her. The first victim testified that her car had numerous aftermarket additions, including a custom stick shift which would be difficult for someone unfamiliar with the vehicle to drive. She was at the door of her blue and white Honda Civic hatchback when she saw three people running toward her. The men were dressed in all black and at least two wore ski masks. The men were not tall or heavyset. She estimated that they were around five feet, four or five inches tall and weighed one hundred forty or fifty pounds. She did not remember if one of the men was five feet ten, as she had said in her statement to police. Two were wearing hoodies, and she saw short dreadlocks coming out of the hoodie of one man. She could tell that the men

- 4 -

were black because she could see their skin through the holes in the masks.

One man pointed a gun between her eyes and demanded her money. He then searched her pockets. Another man took her backpack. The men also took her keys, phone, cigarettes, gum, and lighter. Her wallet was in the car. The men told her to run, and she did. As she ran, she saw the car they had come in, a tan or light brown Honda Civic with tinted windows. The robbery victim was able to write down some of the numbers and letters from the car's license plate and convey these to the 911 operator. She was able to hear the perpetrators start her car, which had an unusually loud engine due to aftermarket additions. She ran to a friend's house and called police from there. Officer Brian Gant testified he later found her backpack in the middle of the lane in the parking lot.

Mr. Boone testified that after the first robbery, Mr. Woods returned to the car. He sat in the front seat and did not get out for the second robbery. Mr. Potter and the [Petitioner] also walked back to the car; however, they did not want to leave without having gained something of value, so they "took off." Mr. Boone at this point saw that the [Petitioner] had a .357 silver revolver.

The victim of the second robbery and shooting testified that he had left his work at around 6:00 a.m. and had just stepped out of his car in front of his home when he saw two men running towards him with guns. The men were wearing dark clothing, hoodies, and ski masks. One had long dreadlocks and carried a black gun, and the other had short dreadlocks and carried a chrome gun. Testimony from the co-defendant and photographs of the suspects at the time of their arrest established that the [Petitioner] had short dreadlocks, Mr. Potter and Mr. Woods had longer dreadlocks, and the twins had short hair. The second victim testified that the men were around five feet ten or eleven inches tall. The second victim screamed as he ran from the armed men, and the man with short dreadlocks said, "Get down you b-tch, I should shoot your a-s for screaming like a little b-tch." The second victim lay face-down on the ground and remained that

way until after the men left. The man with longer dreadlocks searched his bag. The man with shorter dreadlocks searched his pockets and took his wallet and phone. The man with short dreadlocks was agitated because there was nothing in the victim's wallet, and he demanded the victim's personal identification number ("PIN"). The victim gave him a fake PIN. At some point prior to the shooting, the victim's girlfriend opened the door and witnessed the robbery. He told her to shut the door.

After obtaining all the victim's property and a fake PIN, the man with short dreadlocks shot him from two to three feet away as he lay on the ground. The bullet went through his abdomen. The victim pretended to be dead until he heard the men leave. In excruciating pain, the second victim crawled up some steps to his door and tried to verify his identity to his girlfriend, who was afraid to let the robbers into the house where the children were. The second victim's girlfriend had called the police before he got into the house. He testified that his stomach had swollen to the size of a watermelon due to internal bleeding, that he had multiple surgeries, that part of his intestines were removed, and that he still had pain and difficulty with normal bowel functions two years after the crime. He also had a large scar on his stomach.

The second victim's girlfriend confirmed that she opened the door and witnessed the robbery. She testified that she had heard the second victim scream and looked for him out of the windows but could not see him. She heard him speaking and initially thought he might be on the phone. She shouted to him from inside, and when he did not respond, she opened the door. She saw him lying on the ground with two men standing over him. The men were relatively short and skinny. They wore dark clothing, and the way they held their arms indicated to her that they were armed. The victim's girlfriend testified initially that she was not sure if the men were black or white, then said, "[T]hey were not white." She acknowledged having earlier testified that she could not identify their race. . . .

- 6 -

Mr. Boone testified that he wanted to leave after the first robbery, but they waited for the [Petitioner] and Mr. Potter, in part because Mr. Potter's brother was in the car. When they heard a gunshot, they started driving and picked the two up after about five minutes. When the two got in, Mr. Potter sat in the passenger's seat and was shouting, "What the f-ck you shooting for?" They then saw the police coming toward the road into the apartment complex. Mr. Potter asked for the [Petitioner's] gun and threw the gun out of the window. Mr. Boone's twin also gave Mr. Potter a gun which Mr. Potter threw away.

Mr. Boone acknowledged that he was facing significant jail time for the crimes and that he hoped to receive a benefit by testifying. However, he testified that he did not currently have any bargain with prosecutors for his testimony. He also acknowledged having lied during his January 20, 2010 interview with police, where he stated he was asleep during the whole crime. He also asserted that his prior statement that the [Petitioner] had said he shot the victim because the victim was running was a lie and that, at the time, the [Petitioner] gave no reason for shooting the victim. He acknowledged that he did not come forward with his current version of events until October 2011, and he further acknowledged this was after he had received the State's discovery, which included witness statements.

. . . .

The [Petitioner] did not testify. The jury proceeded to convict him of especially aggravated robbery and aggravated robbery as charged in the first two counts, and it convicted him of the lesser-included offense of facilitation of attempted carjacking in the third count. . . . The trial court sentenced the [Petitioner] to twenty-two years for the especially aggravated robbery, ten years for the aggravated robbery, and four years for the facilitation of attempted ca[r]jacking. The sentence for especially aggravated robbery was to run consecutively to the others for an aggregate sentence of thirty-two years.

State v. Michael Terrell McKissack, No. M2013-00533-CCA-R3-CD, 2014 WL 2553438, at *1-6 (Tenn. Crim. App. at Nashville, June 4, 2014). This court affirmed the Petitioner's convictions and sentences on direct appeal. Id. at *1.

Thereafter, the Petitioner filed a pro se petition for post-conviction relief, raising various claims of ineffective assistance of counsel.[1] After the post-conviction court appointed an attorney, an amended petition was filed, alleging in pertinent part (1) that trial counsel was ineffective by failing to call Potter and Woods to testify on his behalf; (2) that trial counsel was ineffective by failing to adduce proof during the guilt phase regarding the Petitioner's "lack of formal education and mental health issues"; and (3) that the Petitioner would have pled guilty if trial counsel had informed him that Boone would testify against him.

At the post-conviction hearing, the twenty-four-year-old Petitioner testified that trial counsel was appointed to represent him. He was eighteen years old when he began meeting with trial counsel. Trial counsel met with him only three times, once at the criminal justice center and twice in court. The Petitioner said that he was "young, lost and just didn't know a lot" and that trial counsel did "[n]ot really" explain the nature of the charges against him. However, he acknowledged that trial counsel provided him with the discovery materials.

The Petitioner said he told trial counsel that he took medication for depression and attention deficit hyperactivity disorder (ADHD) and that he had been treated by the "Mental Health Co-op." After a mental evaluation, the Petitioner was found to be competent to stand trial. The Petitioner wanted trial counsel to call someone to testify at trial regarding his mental health history, but trial counsel did not present any witnesses. The Petitioner said that he had attended school through the tenth grade and that he had a general equivalency diploma (GED) but that he was able to read and write only "a little bit."

The Petitioner said that he asked trial counsel to call members of his family to testify about his "background." Trial counsel told the Petitioner that he attempted to contact the Petitioner's family members but that no one answered his calls. The Petitioner was "disappointed" that his family did not attend his trial.

The Petitioner said that Potter and Woods pled guilty prior to his trial. The Petitioner did not think trial counsel spoke with Potter or Woods about testifying on his behalf. The Petitioner said that trial counsel did not warn him that Boone would testify against him. The Petitioner asserted that if he had known Boone would testify against him, he would have chosen to plead guilty instead of going to trial.

---

[1]The claims raised in the pro se petition have been abandoned on appeal.

- 8 -

The Petitioner believed that the trial strategy was to convince the jury to convict him of lesser-included offenses instead of the charged offenses; however, trial counsel did not explain to the Petitioner "that one of the victims was actually shot in the stomach and that would not, probably would not have been a very likely outcome[.]"

The Petitioner recalled that trial counsel informed him of a plea offer which included a sentence of fifteen years to be served at one hundred percent. The Petitioner said that he and trial counsel did not discuss the plea offer.

The Petitioner said that he thought trial counsel "could have fought for [him] more." As an example, he noted that during trial, trial counsel confused the witness, Kevin Boone, with his twin brother, Keith Boone.

On cross-examination, the State asked if the Petitioner would be surprised to learn that "the jail management system" showed trial counsel attempted to visit the Petitioner five times in 2011 and 2012 but that on two occasions, the Petitioner refused to meet with him. The Petitioner said that he did not recall refusing to meet with counsel. The Petitioner acknowledged that he had a "number" of court dates but asserted that he discussed his case with trial counsel on only two of the court dates.

The Petitioner acknowledged that trial counsel introduced proof about the Petitioner's mental health issues at the sentencing hearing. However, the Petitioner also wanted trial counsel to introduce proof of his mental health issues during the guilt phase. He also wanted his friends and family to testify "about [his] past and what [he had] been going through," such as insomnia and difficulty dealing with his mother's death. The Petitioner conceded that trial counsel had Dr. Brown do a mental evaluation on the Petitioner prior to trial. Dr. Brown found that the Petitioner was competent to stand trial and that no evidence existed to support a diminished capacity defense. The Petitioner said that trial counsel should have requested a second evaluation "because some people don't understand me, understand what I go through, my struggle[.]"

The Petitioner told trial counsel that his co-defendants said they would testify on his behalf. The State asked the Petitioner if he knew that his co-defendants' statements to the police implicated him. The Petitioner responded that his co-defendants could testify that the statements were false but acknowledged that he had not called them as witnesses at the post-conviction hearing.

The Petitioner conceded that Boone testified at trial and identified the Petitioner as one of the perpetrators. The Petitioner acknowledged that trial counsel cross-examined Boone about whether he was testifying in order to get a deal from the State on his pending charges.

- 9 -

The Petitioner said that he "thought [he] was gonna get a deal before [he] came into trial." The Petitioner acknowledged that he was aware the State made a plea offer a couple of months prior to trial. The Petitioner asserted that trial counsel did not tell him that Boone would testify against him and that if he had known, he would have chosen to plead guilty instead of going to trial. The Petitioner said that he would have accepted the plea offer "if [he] had known everybody was pointing a finger at [him], making [him] the bad person out [of] the bunch, as Mr. Boone said, [the Petitioner] wasn't the ring leader, so [the Petitioner] don't see how [he] got all this time." The Petitioner said that he did not know that his co-defendants acknowledged during their guilty plea hearings that the State's version of the events, which implicated the Petitioner, was true.

Trial counsel testified that he was licensed to practice law in 1994 and that he practiced only criminal law. In early 2011, he was appointed to represent the Petitioner. He met with the Petitioner at every court appearance and at least five times at the jail. He filed a "number of pretrial motions," including a motion to suppress.

Trial counsel said that due to his concern that the Petitioner might be unable to understand the proceedings, he asked the trial court to order a mental evaluation. Additionally, trial counsel "thought it was a viable defense that [the Petitioner] kind of got persuaded by the other folks to participate in this, so it was to maybe negate the mental element of the defense[.]" Dr. Brown, who performed the evaluation, determined that the Petitioner had apparent mental health issues but that he was competent to stand trial and that a diminished capacity defense could not be supported.

Trial counsel said that he provided the Petitioner with a copy of the discovery materials and that they discussed the materials. Trial counsel knew Boone was cooperating with the State, and he informed the Petitioner that Boone would testify against him. Therefore, trial counsel surmised that the Petitioner was not surprised when Boone testified at trial. Trial counsel believed the other two co-defendants would not testify for the State because they had pled guilty prior to trial and could no longer negotiate for favorable treatment from the State. Trial counsel said that the State's factual recitation at the co-defendants' guilty plea hearing implicated the Petitioner. Trial counsel said that he never thought any of the co-defendants would testify favorably for the Petitioner, noting, "Every person in the case confessed and implicated each other in the case, with the exception of [the Petitioner]." Trial counsel cross-examined Boone about whether he was testifying in order to obtain a deal from the State. Trial counsel acknowledged that he "might have in the heat of the moment confused [Boone] with his brother" but "that wasn't the sum total of [his] cross-examination of that witness[.]"

Trial counsel said that the prosecutor believed the Petitioner "was the most culpable of the parties that were charged"; therefore, the State's best plea offer was a

sentence of eighteen years at one hundred percent. Trial counsel denied that the State ever offered a sentence of fifteen years. Trial counsel "begged" the Petitioner to accept the eighteen-year sentence, noting that the State's evidence was overwhelming. Trial counsel acknowledged that the victims did not identify the perpetrators, "but they gave identification of the mask, the weapons, close proximity, and then the mask and the weapons found in the car as they were leaving kind of corroborated their story." Trial counsel recalled that his conversations with the Petitioner led him to believe that the Petitioner was involved in the crimes.

Trial counsel said that his trial strategy was to persuade the jury to convict the Petitioner of lesser-included offenses instead of the charged offenses. Trial counsel stated that the Petitioner knew the charges and sentences he was facing. Trial counsel attempted to contact the Petitioner's family members but was unsuccessful in securing their attendance at trial.

On cross-examination, trial counsel said that he did not recall the Petitioner's asking him to interview his co-defendants to see if they would testify on his behalf. Trial counsel stated, "Sometimes I think [the Petitioner] did not appreciate the severity of the charges he was facing and the outcome of the punishment that he was facing[;] I was worried about him, still am." He was "almost positive" he told the Petitioner that Boone would testify for the State because he wanted the Petitioner to be well-informed. Trial counsel acknowledged that he did not tell the Petitioner that he was certain Boone would testify at trial, explaining that he could not "read D.A.'s minds," but he maintained that he "had a good idea of what was going to happen[.]"

The post-conviction court held that the Petitioner failed to prove that his trial counsel was ineffective and denied the petition. On appeal, the Petitioner challenges the post-conviction court's ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against

those findings.  See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).  We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct.  See Fields, 40 S.W.3d at 458.  However, we will review the post-conviction court's conclusions of law purely de novo.  Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense."  Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).  To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases."  Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.  Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

On appeal, the Petitioner first maintains that trial counsel was ineffective by failing to call Potter and Woods to testify on his behalf.  The Petitioner next maintains that trial counsel was ineffective by failing to inform him that Boone would testify against him, asserting that if he had known Boone would testify, he would have accepted a guilty plea instead of proceeding to trial.  Finally, the Petitioner maintains that trial counsel was ineffective by failing to adduce proof during the guilt phase regarding his "lack of formal education and mental health issues."  The State responds that the post-conviction court correctly denied post-conviction relief.  We agree with the State.

Regarding the Petitioner's first claim, we note that the post-conviction court found that the Petitioner failed to call Potter and Woods to testify at the post-conviction hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the

- 12 -

petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit these witnesses might have offered to the Petitioner's case, nor may we guess as to what evidence further investigation may have uncovered. Id. We agree with the post-conviction court that the Petitioner has failed to demonstrate prejudice in this regard.

Regarding the Petitioner's second claim, we note that the post-conviction court accredited trial counsel's testimony that he advised the Petitioner that Boone would testify against him. On appeal, this court generally defers "to a post-conviction court's findings with respect to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013). The post-conviction court further accredited trial counsel's testimony that because of the overwhelming evidence against the Petitioner and "the lack of any defenses," he advised the Petitioner to accept a plea agreement, but the Petitioner refused and chose to go to trial. We agree with the post-conviction court that trial counsel was not ineffective in this regard.

Regarding the Petitioner's final claim, the post-conviction court found that the Petitioner had failed to call his family members or a doctor to testify about his mental health history. Again, we note that "[t]o succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing Black, 794 S.W.2d at 757). Moreover, the post-conviction court found that "[e]ven if the court were to accept this as a true and accurate statement of what the family testimony would have been it would have been inadmissible and immaterial." The court further found that "a claim of diminished capacity and incompetence were not supported so [the] Petitioner's mental state was not at issue." We agree with the post-conviction court that the Petitioner failed to prove ineffective assistance.

## III. Conclusion

In sum, we conclude that the post-conviction court did not err by denying relief. Therefore, the judgment of the post-conviction court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE